Law Offices of GEORGE C. BOISSEAU
State Bar Number 75872
740 4th Street, Second Floor
Santa Rosa, California 95404
Phone:  (707) 578-5636
Fax: (707) 578-1141
E-Mail: boisseaugc@msn.com

Law Offices of  DENA MARIE YOUNG
State Bar Number 215344
740 4th Street, Second Floor
Santa Rosa, California 95404
Phone:  (707) 528-9479
Fax: (707) 692-5314
E-Mail: dmyounglaw@gmail.com

Attorneys for Defendant
LUKE D. BRUGNARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR-14-00306-WHA |
| Plaintiff, | SUPPLEMENTAL BRIEFING IN SUPPORT |
| v. | OF MOTION FOR NEW TRIAL |
| LUKE D. BRUGNARA, | (F.R.Crim.P. 33) |
| Defendant. | |
| | SPEEDY TRIAL EXCLUSION: <u>Not Applicable</u> |

The defendant, LUKE D. BRUGNARA (BRUGNARA), by and through his attorneys of record, Dena Young and George C. Boisseau, hereby submit this supplemental briefing in support of his motion for new trial.

## INTRODUCTION

This a further request for a new trial based on "new" evidence previously undiscovered by the defense which shows that most the artwork in question in this case is virtually worthless, probably "fake," and certainly worth far less than the $11 million price tag put on it by the "victims."  Straddling the line between impeachment evidence and evidence relating to the elements of mail and wire fraud counts, such "value" evidence was not presented on trial, partly

as a result of poor preparation by the defense and partly because of the government's willingness to look the other way and not question its only sources of information regarding the artwork's value, "victims" Walter Maibaum (Maibaum) and Rose Long (Long). This "deliberate ignorance" by the government, even after being asked point blank by the court whether it would be appraising the art and telling the court that it would do so prior to trial, has led to a distortion of the fact finding process. Given that the rationale for a motion for new trial is to preserve a defendant's right to a fair trial and to preserve the integrity of the fact-finding process to insure a reliable judgment, a new trial is warranted in this case not only to save the defendant from himself but more importantly to see that justice is done.

On August 28, 2015, the defense submitted the report of Victor Wiener, art appraiser and consultant, regarding the value of the paintings and etchings attributed to Willem De Kooning, George Luks, Joan Miró and Pablo Picasso. Mr. Wiener also appraised the Valsuani casting of the "Little Dancer of Fourteen Years" attributed to Edgar Degas. These works were sent by Long to BRUGNARA for the purported purchase price of $11 million.

These works, as it turns out, have a value far less than $11 million. In fact, much of the artwork is worthless and not as it was represented to BRUGNARA during his discussions with Long. The purported de Koonings, invoiced by Maibaum and Long in excess of $7 million, are not believed by the government and defense experts to have been painted by de Kooning and have a fair market value somewhere between zero and $80,000. The upper range is a "speculation" value resulting from the incomplete "provenance" which "attributes" the 16 paintings on paper to de Kooning.[1] The painting attributed to George Luks, invoiced by Long at $450,000, has a value of between $4,000 and $30,000. The Miró drawing and Pablo Picasso etchings, were valued by both the government and defense experts between $100,000 and $110,000 for the Miró and $73,000 to $75,000 for the Picassos.

---

[1] The government expert, Christopher Gaillard, opines that the 16 paintings attributed to de Kooning have "no commercial value."

2

Excepting for the moment the Valsuani Little Dancer, the government expert values the artwork at $177,000, even though Maibaum and Long valued it at over $8 million. The defense expert values the artworks a bit higher at $295,000, still a far cry from the Maibaum and Long invoiced amounts of over $8 million.

Mr. Wiener found that the Valsuani Little Dancer, attributed by to Edgar Degas, to have a fair market value of $600,000.[2] Mr. Gaillard, however, was not asked by the government to appraise it. Rather, the government seeks to value it at $1.8 million based upon a price allegedly bid for it at an auction in Hong Kong in 2011 without any proof that someone actually paid this price or whether they knew it was a Valsuani casting of the Little Dancer.[3]

In this case, the government proceeded at trial arguing that BRUGNARA defrauded Maibaum and Long out of $11 million of artwork. Relying on Maibaum and Long as experts on these particulars works in regards to value and authenticity, the government concentrated its efforts to show that BRUGNARA could not afford $11 million and therefore intended to defraud them of the "valuable" artwork. In a classic "gilding of the lilies" move, Long (along with Maibaum) testified at length about the importance of BRUGNARA's museum claim to their decision to "discount" their prices and to the need for the public to view these "beautiful" works

---

[2] The rise and fall of the Valsuani Little Dancers (and their value) relies mainly on the marketing efforts of Walter Maibaum and his "associates." Even according to Maibaum, the Valsuani castings of the Little Dancer (and other bronzes attributed to Degas) were literally "given away" until Maibaum "discovered" that they were castings from Degas's original plasters, even more "authentic" than the Hebrard castings, a rationale used to explain the obvious differences between the two. Maibaum, who has owned and controlled as many as 20 Little Dancers over the years, currently claims to have 3 of them on hand. Many have been "sold" or "loaned" out to others over the years at varying prices, reflecting mostly the desire to give the appearance of value rather than reflective of a real demand for the product. Inexplicably, the FBI never actually saw a Little Dancer in either Maibaum's, Long's or Parrish's possession, concentrating most of their efforts in trying to retrieve the Little Dancer sent to BRUGNARA, the same one returned to Maibaum from Yank Barry who claimed Maibaum had defrauded him by falsely attributing the bronze to Edgar Degas.

[3] Mr. Wiener considered this alleged auction price at arriving at what he believed was the fair market value of the piece in 2014. He testified at length at the evidentiary hearing held on September 2, 2014 and included all the information on the various transactions involving Valsuani Little Dancers in his 130-page report submitted to the court.

3

1  of art.[4]  As it turns out, there is Maibaum's and Long's testimony against BRUGNARA, the
2  government's theory based upon their testimony, and the truth about this artwork, only revealed
3  after trial, which contradicts both.
4       As presented to the jury, the case purportedly was based upon two victims, Maibaum
5  and Long, being defrauded by BRUGNARA to relinquish their "very valuable" artwork.  The
6  truth is far different.  In a market economy, where one can buy low and sell high as long as there
7  is a willing buyer and demand, critical to a working system is a knowledgeable buyer knowing
8  the true facts.  The case presented by the government to the jury is premised on lies by the
9  purported victims, facts withheld from the trier of fact regardless who may be at fault for the
10 truncated presentation.  To ignore the fact that the artwork was practically worthless, certainly
11 not worth the millions of dollars claimed, is to perpetuate a fraud upon the court, with the only
12 real "victim" being the truth.

### MAIBAUM AND LONG TESTIMONY

14      Maibaum has been an art dealer since 1968 and has, according to his own estimates,
15 sold over $100 million in artwork over the span of his career (RT 348).  A large part of his
16 business is to check out the "provenance" of a particular piece of art (RT 350-351).  His personal
17 library, containing over 8,000 books, helps him determine authenticity (RT 352).
18      Having at one time owned many of the pieces of art in question, he gave values to all,
19 including even addressing concerns by Long in her counterclaim to his negligence lawsuit against
20 her that the George Luks "Portrait of Gertrude Vanderbilt Whitney" was not as claimed by
21 testifying, "I said it's always been known by that name.  I can't imagine it would be known by
22 any other name." (RT 358-359, 365, 451-452, 495).[5]

---

[4] The disconnect between this statement and the truth was, unfortunately, not discovered until the artwork was finally appraised for the first time after trial.  The entire transaction in this case between Maibaum, Long, and BRUGNARA is best described by the quote attributed to Al Capp: "Abstract art: a product of the untalented sold by the unprincipled to the utterly bewildered."  Apologies, of course, to the artists and purveyors of original and authentic modern art.

[5] Maibaum did testify, however, that Long was the "expert" on George Luks (RT 363).

4

1   Maibaum also testified at length regarding the importance of de Kooning and the
2   paintings on paper which were purportedly sold to BRUGNARA for $7 million (RT 362-363)
3   According to Maibaum, that the de Koonings would be in a "museum" (and thus available to the
4   general public) was very important to him (RT 369).
5   Ironically (and a portend of things to come), Maibaum acknowledged that authenticity
6   determines value, although in fairness he was discussing the Valsuani Little Dancers during this
7   portion of his testimony:

> Well, authenticity determines value, If something is authentic, it has one value.
> If it's not authentic, obviously it would have no value or hardly any value.

(RT 380).[6]  But he did not limit his expert opinion to the Little Dancer.  Maibaum testified about the 16 de Kooning paintings on paper, emphasizing their impeccable "provenance."  ( RT 412-414, 468, 479, 484, 484).[7]

Long started her business in 1979, sold art, lectured at museums, taught restoration work to many museums and restoration halls, and worked as an art authenticator throughout her career (RT 623-625).  She has sold probably 300 pieces of art (RT 768).  She repeatedly emphasized "the extreme amount of value and extremely important works of art" at issue in this case (RT 677).  She wanted the de Koonings, all 16 of them, to be each hung in the proper order in BRUGNARA's museum (RT 678).  She was "horrified" that she had left these valuable works of art in someone's garage, something she had never done before (RT 723).  Long testified that her Luks' had substantial value, scoffing at BRUGNARA's claim that Sotheby's had valued it at

---

[6] Much of Maibaum's direct testimony was devoted to his rationale why the Valsuani Little Dancers had value, given the $3 million invoice to BRUGNARA (RT 385-405, 600-601, 610-611).  In a prophetic response to a question put to Maibaum regarding the value of Valsuani bronzes, Maibaum replied that "the Valsuani bronzes are worthless." (RT 380).  In fairness and in context, his reply was probably that they are "worth less" than the Hebrard bronzes.

[7] Maibaum "deferred" to Long being the expert in de Koonings (RT 479).  Maibaum testified that Long represented to him that she knew works by the artist and had experience with de Koonings' (RT 479, 507).  "What I relied on was the provenance documents that were provided to Modernism Fine Arts and then Rose Long's acceptance of the works by de Kooning as someone who is knowledgeable on the artist."  (RT 506).

5

1    $30,000 to $50,000 saying that, in fact, she had paid $350,000 for it recently (RT 736-737). She
2    even testified that the painting was not really damaged at all (despite the fact someone had put a
3    foot through it) as the damage was "not in the image." (RT 768).

4    Long emphasized in her testimony that these "types of works" only belong in a museum
5    (RT 674). They had, according to Long, had an "extreme amount of value" and were "extremely
6    important works of art." (RT 677).

7    Given the evidence just recently discovered that this artwork is worthless, Maibaum's
8    and Long's testimony must be viewed differently. They were experienced in the artwork. Most
9    certainly they knew that the de Koonings were not worth $7 million and were probably fake. The
10   problems with these "paintings" are obvious to those knowledgeable in the field–Maibaum and
11   Long are not novices, they have decades of experience selling, buying and authenticating art. Far
12   from being "victims," this new evidence points to their complicity in a fraudulent sale of millions
13   of dollar of bogus artwork.

14   While hints to their fraud may have been seen at trial, the smoking gun had not been
15   discovered. During trial Long testified that she was going to make $1 million on the sale of the
16   Little Dancer, $100,000 on the sale of her Luks, but had never settled on the commission for the
17   rest of the artwork (RT 918).[8] She claimed that the only direction she received from Maibaum,
18   save the prices, was to never mention his name. He was to remain anonymous at all costs (RT
19   818, 901, 928).

20                               GOVERNMENT'S CASE

21   The government, having qualified Maibaum and Long as their "experts" on the value
22   and authenticity of the artwork in question, maintained that all of it was truly worth $11 million.

---

[8] This testimony differed dramatically from her testimony on June 16, 2014, wherein she said she was going to make $500,000 on the sale of the de Koonings, the difference between the invoice to her from Modernism ($5.692 million) and that invoiced to BRUGNARA ($6.88 million) (6/16/2014 RT 121). The original price for the de Koonings was $7.36 million, but purportedly BRUGNARA was offered a 10% discount (6/16/2014 RT 104, 121, 122-125). The invoices never quite added up properly, a problem Long attributed to her lack of word processing skills (6/16/2014 RT 124-125).

6

1   In closing argument, government counsel stated:

2       You also heard testimony about the artwork and the value that it had to Ms.
    Long, Walter Maibaum and others. Rose Long, herself, paid $350,000 for the
3       George Luks painting. Mr. Maibaum spend a great deal of time talking to you
    about the provenance of the Little Dancer, the sculpture that's now missing,
4       and the value of the Valsuani casts that were found. This is not from the
    original Degas casting, but was discovered later. You will recall that testimony
5       and the value and importance Mr. Maibaum put on that statute.

6   (RT 2918). Government counsel also emphasized how Maibaum and Long as art lovers saw the

7   importance of these artworks being placed in a museum "so the public could enjoy these

8   beautiful works of art." (RT 2922).

9       But the mention of a museum and the false promise from the defendant about a
    museum made the transaction seem more legitimate to Rose Long and Walter
10      Maibaum, and it also played to their psyche as lovers of art and people who
    wanted the world to see pieces like the Valsuani Degas Little Dancer, which
11      unfortunately you have not been able to see in person because it was stolen.

12  (RT 2923).[9]

13      Government counsel never veered from the central theme that this was "valuable" art:

14      The government has also proven to you that the defendant's false statements
    about buying the art, having the ability to buy the art, and putting it in a
15      museum were material. Rose Long actually agreed to discount the price
    because the art was going to a museum. That shows you the importance and
16      the value she placed on having these beautiful works of art shown so that the
    public can enjoy them. And the statement about having the money to pay for
17      the art, buying (indicating quotation marks) the art was absolutely material.
    Ms. Long testified that this was always a financial transaction.
18

19  (RT 2957). Ironically, government counsel argued that "no legitimate art transaction rests on lies

20  and no lie supports a legitimate art transaction." (RT 2960). Indeed, in rebuttal, government

21  counsel argued that:

22      Rose Long's intent was a legitimate art deal, to sell Mr. Brugnara art. Mr.
    Brugnara's intent was to commit fraud. There could never be a meeting of the
23      minds. Mr. Brugnara was trying to defraud her. Ms. Long was legitimately
    trying to have an art transaction. Of course, there was no meeting of the minds.
24      Mr. Brugnara also tried to suggest to you that somehow he was being

25  _____

[9]   Of course, Maibaum could have provided the jury with a glimpse of the 3 Little Dancers
26  he still had in his possession, or pictures of the more than 20 he possessed recently. Long
claimed to own one as well. The government could have also asked Yank Barry for a picture as
27  the one purportedly sold to BRUGNARA was the same one Barry returned claiming he had been
28  defrauded by Maibaum.

7

1 |     defrauded by Rose Long and Walter Maibaum.  There is no evidence to support that.

(RT 3095).

Although repeatedly arguing to the court that it did not matter whether BRUGNARA was being defrauded by Maibaum and Long (and briefing mentioning this to the jury at the same time as emphasizing there was no evidence to support such a contention), the case proceeded to trial as if the de Koonings were authentic and the Luks was truly worth the $450,000 asking price. The government, despite the court's early concern as to authenticity of the artwork, reassured the court that it would be appraising the artwork in question. Yet, no attempt was made to appraise the artwork until after trial and after the defense had finally obtained an expert to appraise it. Thus, the case proceeded to trial premised on a lie–that the artwork was worth $11 million and that BRUGNARA had no way of coming up with such an amount.

But the faulty premise upon which this case relies says more than just the government closing its eyes to all the red-flags that presented themselves pretrial and at trial. It speaks volumes as to the credibility (or lack thereof) of the government's two key witnesses against BRUGNARA–Maibaum and Long. While it may have been unwise to rely on them as "experts" on the very art they claimed they were defrauded of because of their potential biases as "victims," what happened is far worse. With their combined experience of over a hundred years of buying, selling and authenticating art, they outright lied about the authenticity and worth of the de Koonings and the George Luks painting–to a tune of over $7 million. They undoubtedly knew what the defense's and government's experts testified to on September 2, 2015, that the de Koonings were 'fake" and the Luks was both damaged so extensively (with questions about its authenticity to boot) that it was practically worthless–certainly not the $450,000 claimed by Long who has extensive experience in not only authentication but restoring damaged art.

The government claims now that it did not know about the deception. But if a defendant is deemed to have acted knowingly if he or she was aware of a high probability that something was true and deliberately avoided learning the truth, should not the government be held to the same standard. See United States v. Jewell, 532 F.2d 697, 699 (9th Cir.1976)(en

8

banc); United States v. Heredia, 483 F.3d 913, 920 (9th Cir.2007)(en banc). The government's investigation into Maibaum's past showed many instances of questionable art deals which Maibaum brushed away saying others were at fault, not him. Many of these are outlined in Mr. Wiener's report to the court but they first came up in the FBI 302's of Maibaum.[10] At least there were enough red-flags in Maibaum's past (not even mentioning the controversy surrounding the Valsuani castings of the Little Dancer) to warrant an examination of the artwork in question to determine whether it truly was worth $11 million. Anything less could result in what has happened in this case–a trial pitting a defendant who was allegedly defrauding somebody who was defrauding him by selling him millions of dollars of worthless artwork. The trier of fact, unfortunately, was not presented that case but rather a case featuring Maibaum and Long as victims who were being defrauded of millions of dollars of "valuable" artwork. This is certainly not capitalism at work, or at least it should not be what is supported by our system of justice. Unfortunately, a search for the truth is not what this case was about at trial. Nevertheless, it is not to late according to the rules of procedure to remedy this injustice.

---

[10] Maibaum had been involved in other litigation involving fake art and false provenance for that art. In one case, he had sold, through a third party (as he did here) a Picasso bronze which he claimed was authentic when in fact it was a casting made from a casting rather than an original bronze. During the investigation of that case, it was learned that Maibaum had created a fictitious owner in an effort to give the work some provenance.

The Little Dancer at issue here had been previously sold to Canadian philanthropist Yank Barry for a charity raffle. Barry later claimed that the work was not authentic Degas as Maibaum had told him. That suit was settled quietly shortly after Barry demanded that the plaster be subjected to scientific testing to establish its authenticity. That Little Dancer was returned to Maibaum, and subsequently "sold" to BRUGNARA.

When confronted with these problems, the government went to Maibaum and asked him for an explanation, but apparently did no independent investigation.

9

## ARGUMENT

### BRUGNARA IS ENTITLED TO A NEW TRIAL BECAUSE OF THE NEWLY DISCOVERED EVIDENCE THAT THE MAJORITY OF THE ARTWORK IN THIS CASE WAS WORTHLESS AND THE KEY GOVERNMENT WITNESSES, MAIBAUM AND LONG, LIED ABOUT ITS AUTHENTICITY AND $11 MILLION WORTH.

A. <u>General Principles Regarding Newly Discovered Evidence</u>.

To qualify for a new trial, a defendant claiming "newly discovered evidence" must establish: "(1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not (a) cumulative or (b) merely impeaching; and (5) the evidence indicates the defendant would probably be acquitted in a new trial." <u>United States v. Hinkson</u>, 585 F.3d 1247, 1264 (9th Cir.2009)(<u>en banc</u>); <u>United States v. Berry</u>, 624 F.3d 1031, 1042 (9th Cir.2010); see also <u>Unites States v. Harrington</u>, 410 F.3d 598, 601 (9th Cir.2005); <u>United States v. Krasney</u>, 607 F.2d 840, 845 n.3 (9th Cir.1979)(noting that materiality and probability requirements "are really two means of measuring the same thing"); <u>United States v. Davila</u>, 428 F.2d 465, 466 (9th Cir.1970)(<u>per curiam</u>)(noting that newly discovered impeachment evidence supports a new trial if "it is likely that the jury would have reached a different result" in light of the evidence).

Even impeaching evidence may properly support a motion for new trial under Rule 33. The Ninth Circuit has expressly rejected the proposition that "impeachment evidence...is never sufficient to warrant a new trial under Fed.R.Crim.P. 33." <u>United States v. Davis</u>, 960 F.2d 820, 825 (9th Cir.1992); see also <u>United States v. Wallach</u>, 935 F.2d 445 (2nd Cir.1991) as amended (concluding that new evidence impeaching the government's central witness was sufficiently powerful to require a new trial); <u>United States v. Taglia</u>, 922 F.2d 413, 415 (7th Cir.1991)(explaining that the prohibition on using impeachment evidence to secure a new trial should not be "taken at face value"); <u>Balestreri v. United States</u>, 224 F.2d 915, 917 (9th Cir.1955)("To deny in every case a motion for new trial on the ground of newly discovered evidence for the sole reason that the evidence was 'merely impeachment' might often lead to injustice). The <u>Davis</u> court recognized that enforcing a per se prohibition on impeachment evidence as a basis for a new trial would be inconsistent with the spirit of Rule 33, which

10

"permits the granting of a new trial 'if required in the interest of justice.'" <u>Davis</u>, 960 F.2d at p. 825. A per se prohibition would also be inconsistent with the court's longstanding refusal to draw a categorical distinction between types of evidence. See <u>Taglia</u>, 922 F.2d at p. 415; <u>Giglion v. United States</u>, 405 U.S. 150, 154-55 (1972)(refusing to distinguish between exculpatory and impeachment evidence in the <u>Brady</u> context); <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)(refusing to distinguish between exculpatory and impeachment evidence in cases involving prosecutorial misconduct). As <u>Davis</u> explained, sometimes

> newly discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible. In such a case, if the witness' testimony were uncorroborated and provided the only evidence on an essential element of the government's case, the impeachment evidence would be 'material' under the Harrington test.

<u>United States v. Davis</u>, <u>supra</u>, 960 F.2d at p. 825; see also <u>Taglia</u>, 922 F.2d at p. 415 (holding that a new trial would be warranted under Rule 33 if it were discovered after trial that the government's star witness was "utterly unworthy of being believed because he had lied consistently in a string of previous cases"); <u>United States v. Krasny</u>, <u>supra</u>, 607 F.2d at p. 845.

       B.    <u>The Evidence that the de Koonings and Luks Were Worthless Warrants the Granting of a New Trial</u>.

In this case, the defense discovered only after trial that the 16 de Kooning paintings on paper, valued by Maibaum and Long at over $7 million, were almost worthless and probably fake.[11] The government's expert witness, retained the same time as the defense expert, also opined that the de Koonings had "no commercial value." The Luks', sold by Long to BRUGNARA for $450,000, was appraised by Mr. Wiener and Mr. Gaillard to only be worth

---

[11] Shortly after being appointed to the case, the undersigned attorneys reviewed the trial record and discovery in the case. An expert art appraiser was found and funding was obtained for his services. The defense was thus diligent in obtaining the valuation evidence. The fact that it could have been "discovered" earlier is not germane for that may be said of any newly discovered evidence which by its own terms means that it was out there somewhere to be found. Newly "manufactured" evidence may well not have existed previously, but that is not what we are dealing with in this case.

1  between $4,000 and $30,000.[12]

2  The first question posited by this new revelation, is whether this evidence was newly
3  discovered. It certainly was newly discovered as the defense presented no expert testimony
4  regarding the artwork at trial and had retained no expert to appraise it in preparation for trial. For
5  that matter, neither did the government. Despite the red-flags surrounding Maibaum and Long
6  and their past association and dealings, the government relied on them to provide expert
7  testimony on the value of the artwork, somewhat hedging its bet by reserving a legal position that
8  it did not matter if Maibaum and Long were defrauding BRUGNARA because the evidence
9  showed that he was defrauding them.

10  That this evidence is material cannot seriously be questioned. The government's case
11  depended on the fact that the artwork was worth $11 million. Not only was the credibility of its
12  star witnesses dependent upon such worth, the government's fraud theory was premised on the
13  fact that BRUGNARA could never have come up with $11 million to buy this art. The fact that
14  the majority of the artwork was worthless (or worse fake) completely destroys both the credibility
15  of Maibaum and Long and the government's theory of the case.[13]

---

[12]  To be fair, the Picasso etchings and Miró drawing were found by the defense and government experts to be authentic, although valued far less than purportedly invoiced by Long to BRUGNARA. Long offered the Picasso's to BRUGNARA for $145,000 but were valued by the defense and prosecution experts to be worth between $73,000 and $75,000. The Miro was similarly offered to BRUGNARA at $160,000 but valued by the experts to be worth between $100,000 and $110,000. The government at the evidentiary hearing took issue with the defense expert valuation of the Miró drawing at the low-end of the range of $100,000 to $160,000 even though their own expert gave it a value of only $100,000. Long's and Maibaum's offering of the Picasso's and Miró to BRUGNARA may well be an example of the "American way," buy low, sell high and make an exorbitant profit, but when coupled with the sale of fake de Koonings and a heavily damaged Luks (which might not be a Luks after all) for millions of dollars, the entire transaction on their end smacks of fraud and not just fair profiteering.

[13]  As unsympathetic, unappealing, unmanageable and disruptive as BRUGNARA was during trial, it cannot be denied that his plaintive cries that the artwork was fake turns out to be true. He stands convicted of perjury for testifying that an expert at Sotheby's had told him that the artwork was worthless wherein the crux of the testimony, that the artwork was worthless, is indeed true, but he probably had not received such information from the person he claims to have contacted at Sotheby's. Many of his emails, advising Long that he was considering the worthless art as a gift, scoffed at and ridiculed by Maibaum and Long during their testimony, now ring true

The materiality of this newly discovered evidence to BRUGNARA's defense is highlighted by BRUGNARA's ill fated attempt at trial to cross-examine of Mr. Alexander Rotter (Rotter), the head of the Contemporary Art Department at Sotheby's.  The government has argued that BRUGNARA "veered immediately into the objectionable and irrelevant" and therefore this Court properly ended the cross-examination of this witness (Government Response, hereinafter referred to as Doc. 703, p. 2).  In arguing its position, the government posits that BRUGNARA wanted to ask Rotter about the value of the de Kooning paintings at issue in this case.  (Doc. 703, pp. 2-3).

The government's opposition in this regard points to the importance of the issue and the lack of defense evidence to rebut Maibaum's and Long's testimony.  Even if BRUGNARA had wanted to ask Rotter what these de Koonings were worth, and not just what an art appraiser and authenticator would need to do to authenticate and appraise de Kooning paintings, there was no evidence at trial by the defense on their value.  BRUGNARA was not even allowed, either on cross-examination or recall, to ask Rotter whether the government had asked him or anyone at Sotheby's (to his knowledge) to authenticate or appraise the de Koonings' in question.[14]

The government's position, reiterated time and time again at trial, was that the value of the de Koonings or the other works of art in this case was not a proper area of inquiry.  (Doc. 703, p. 4)  Its position was that BRUGNARA committed fraud regardless of the authenticity and value of the de Koonings, which were "valued' by Maibaum and Long at over $7 million.  Perhaps it would be unfair to suggest that the government had its doubts as to the authenticity of the artwork in question, and thus had a backup in case the defense could have established that the

---

because the artwork was almost worthless--more approaching the value he told them it was worth than the $11 million Maibaum and Long claimed.

[14]   Rotter had already testified for the government as to what was necessary to appraise a Willem de Kooning painting.   He replied that an expert such as himself would have to look at the painting's history, literature references, exhibit history and ultimately speak to representatives from the de Kooning Foundation.  Maibaum and Long would have known this but nevertheless persisted in claiming it was worth millions.

13

1  artwork was worthless, but the case plodded on as if the artwork was extremely valuable whereas
2  it is now known that is not the case.
3        BRUGNARA wanted to defend himself on the theory that he was defrauded by Long
4  and Maibaum. The value of the Valsuani cast Degas Little Dancer and the de Kooning paintings
5  were thus at the heart of the matter. But the only evidence on the issue was from very persons
6  who were selling the artwork for $11 million–Long and Maibaum.
7        No one had independently valued the art in question and that is why this newly
8  discovered evidence is so material. It was exactly the point BRUGNARA needed to establish.
9  Regardless of the government's position that it did not matter whether the artwork was worthless,
10  this Court had previously denied the government's motion to exclude evidence regarding value
11  or the authenticity of the art at issue. (Final Order re Motions in Limine, Document 224)  As
12  this Court correctly pointed out, the government sought to show that the defendant was broke but
13  that fact was only relevant if the art was worth millions and if it were worth only a few hundred
14  dollars, then even a broke defendant could have scrounged around for the money.
15        Also, the value goes to the credibility of the government's victim witnesses. If
   they were trying themselves to defraud the accused in the very same deal, then
16        that conduct would shed light on their credibility.
17  (Final Order re Motions in Limine, Document 224.)  BRUGNARA, however, had no evidence to
18  show that the artwork was not authentic. This newly discovered evidence casts doubt on the
19  credibility of Maibaum and Long and exposes the nature of their scheme. BRUGNARA's entire
20  defense was premised on the fact that the artwork was relatively worthless and certainly not
21  worth the $11 million opined by Maibaum and Long and, now that the defense has such
22  evidence, it would be fundamentally unfair not to grant a new trial.
23        The credibility of Maibaum and Long was intertwined in the government's theory of the
24  case. It cannot be said enough that the initial contact between the parties was made by the
25  purported victim, Rose Long. Long had sold art to BRUGNARA ten years before, had not
26  maintained contact with him since, and without any information regarding his current financial
27  status or ability to pay for any art, called BRUGNARA falsely claiming she wished to dispose of
28  much of her art collection and that it would look nice in his "museum." The first mention of any

1  "museum" was by Long, even though at trial she testified she was appalled (and concerned) that
2  the artwork she signed for was being delivered to a garage at a residence instead of a "museum."
3  Of course, during the series of emails, she falsely wrote that she only dealt with one potential
4  buyer at a time and that all the artwork belonged to her.

5  True, there were numerous falsehoods and half-truths testified to and mentioned during
6  the course of the trial.  However, BRUGNARA was not the only source of such deceptive
7  statements.  Most of everything Long said about the artwork, including that she owned it, was
8  false.  Even though BRUGNARA would not pay any deposit or even pay for the shipping costs,
9  Long delivered to BRUGNARA her "valuable" works of art, including a Degas' Little Dancer,
10 paintings and etchings by Picasso, Luks, de Kooning, and Miró for a "discounted" price to
11 BRUGNARA's residence.

12 This case would be different if BRUGNARA had initially solicited Long to buy her
13 "valuable" artwork or had even agreed to pay some money as a deposit for the $11 million in art
14 being shipped to his home.  Long, however, shipped all of the art, at her undisclosed
15 "associate's" expense, to BRUGNARA without so much as a deposit, contract, or escrow
16 arrangement to insure payment.  She was a self-proclaimed sophisticated purveyor of the arts
17 who had sold and purchased millions of dollars worth of artwork in her many years in the
18 business.  She testified at length about her training and experience in selling, restoring,
19 authenticating, and appraising works of art.  Perhaps not so surprisingly, Long and Maibaum
20 were the only witnesses called by the government to verify the authenticity and value of all the
21 works of art involved in this case.

22 Having met the newly discovered and materiality prongs of the test, remaining is
23 whether with this new evidence would result in BRUGNARA's acquittal of the mail and wire
24 fraud counts.  If this evidence is presented at trial, neither the government's theory about
25 BRUGNARA not having sufficient money to pay for the artwork in question and nor its key
26 witnesses, Maibaum and Long, have any credibility.  The jury would be presented with a case
27 wherein the biggest fraudsters were the government's own witnesses.  The government position
28 was that it did not matter whether the art was worth $11 million or whether BRUGNARA was

defrauded as it was not a defense to the charged mail fraud probably would be rejected if the jury knew that the artwork in question was virtually worthless and that Maibaum and Long had lied repeatedly about the "valuable" artwork so wrongfully wrested from them by BRUGNARA.  See United States v. Oren, 893 F.2d 1057, 1061 (9th Cir.1990) and United States v. Treadwell, 593 F.3d 990, 996 (9th Cir.2010).[15]   Had BRUGNARA been able to prove what he so desperately wanted to tell the jury–that the artwork he was been accused of stealing was fake–such evidence would have cast the credibility of Maibaum and Long, and the true nature of the transaction, in an entirely different light.

While the court did point out to BRUGNARA that he knew he was buying a Valsuani Degas Little Dancer and that Maibaum and Long could charge anything they wanted for it despite the considerable controversy regarding its authenticity and worth,  the value of the de Koonings and other paintings depended upon their authenticity, the very issue BRUGNARA could not prove previously but in a new trial would be able to show the jury.

At the heart of this case was the value of the artwork Maibaum and Long delivered to BRUGNARA's garage.  Stripped of the histrionics, complaints about not being released on bail and conditions of confinement, BRUGNARA at all times complained that the art was worthless. While the government posited that it did not matter whether it was worth $10 or $11 million,

---

[15]   The defense believes that United States v. Oren, 893 F.2d 1057, 1061 (9th Cir.1990) does not support the proposition that it is not a defense to mail and wire fraud that the one defrauding is himself or herself being defrauded by the alleged victims.  "Fundamental fairness" would seem to at least bring into play the civil concepts of equitable estoppel and unjust enrichment to such a situation.  See generally, Garcia v. Brockway, 526 F.3d 456, 465 (9th Cir. 2008); Coda v. Baxter Healthcare Corp., 920 F.2d 446, 451 (7th Cir.1990).  In such a situation, how does the government choose which party to prosecute, bringing into play selective prosecution issues.  As argued previously, if it could be established that BRUGNARA was being defrauded because he was being sold worthless art, is the one who is defrauding another of worthless art which is being sold for millions of dollars more culpable than the one who is trying to sell such worthless art in the first place.  If the government decides to prosecute one and not the other, should not the jury be able to decide who is more culpable or if anyone broke a law, leaving it to a civil jury to decide damages?

logic dictates otherwise.[16]

A new trial should be granted. The fact that the artwork at the heart of this case was fake is newly discovered, material, and would likely result in BRUGNARA's acquittal. Fundamental concepts of fair play, justice, and the fact that trials should be a search for the truth, compel such a result.

## CONCLUSION

For the foregoing reasons, BRUGNARA respectfully requests that the court grant this motion for new trial.

Dated: September 11, 2015

                                        Respectfully submitted,

                                           /s/
                                      GEORGE C. BOISSEAU
                                      DENA MARIEYOUNG

                                      Attorneys for Defendant
                                      LUKE D. BRUGNARA

---

[16] And it's not like Maibaum's antics have stopped. In his request for the return of the de Koonings and other works, a declaration was filed indicating that they were being sold for $6 million and needed to be released immediately. When the court wanted more information on such a sale, the next declaration backtracked and "clarified" their position that the de Kooning were actually being shopped for that amount, not that there was a "buyer" at that price. The final declaration was an attack on Mr. Wiener even before he had seen the artwork in question or had rendered an opinion about its worth, a tactic which to all suggested that they knew the art was worthless and were attempting to discredit any such opinion in advance. Of course, they had not anticipated that the government's own expert would opine that the artwork was even more worthless.

CERTIFICATE OF ELECTRONIC FILING

The undersigned hereby certifies that a copy of the foregoing <u>SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL</u> was served this date to the following parties and attorneys for parties by e-filing and mailing a copy to:

> Benjamin Kingsley
> Robin Harris
> Assistant U.S. Attorneys
> United States Attorney's Office
> Northern District of California
> 11th Floor Federal Building
> 450 Golden Gate Avenue
> San Francisco, California 94102
> Fax: (415) 436-7234

I caused the following additional parties to be personally served by mailing a copy to:

> Not Applicable

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of September, 2015, in Santa Rosa, California.

/s/

GEORGE C. BOISSEAU