1  Law Offices of GEORGE C. BOISSEAU
   State Bar Number 75872
2  740 4th Street, Second Floor
   Santa Rosa, California 95404
3  Phone:  (707) 578-5636
   Fax: (707) 578-1141
4  E-Mail: boisseaugc@msn.com

5  Law Offices of  DENA MARIE YOUNG
   State Bar Number 215344
6  2360 Mendocino Ave., Suite A2, PMB #206
   Santa Rosa, California 95403
7  Phone:  (707) 528-9479
   Fax: (707) 692-5314
8  E-Mail: dmyounglaw@gmail.com

9  Attorneys for Defendant
   LUKE D. BRUGNARA
10

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13
   UNITED STATES OF AMERICA,          )     CR-14-0306-WHA
14
                Plaintiff,            )     DEFENDANT'S
15                                    )     SENTENCING MEMORANDUM
   v.                                 )     AND REQUEST FOR
16                                    )     SENTENCING HEARING
   LUKE D. BRUGNARA,                  )
17                                    )     Date: October 8, 2015
                Defendant.            )     Time: 8:00 a.m.
18  _____  )

19

20        The defendant, LUKE D. BRUGNARA (BRUGNARA), by and through his counsel

21  of record, George C. Boisseau and Dena Young, hereby submits his Sentencing Memorandum

22  and hereby requests a sentencing hearing.

23                          INTRODUCTION

24        A separate evidentiary hearing was held regarding the value of the art works in

25  question.  The evidence now before this Court has placed BRUGNARA in a far different

26  posture for sentencing than shortly after trial.  The Pre-Sentence Report fails to take this into

27  consideration.  Rather, the report focuses on the negative aspects of BRUGNARA's

28  personality, punishing his *persona* as opposed to his criminal conduct.

                                  1

   DEFENDANT'S SENTENCING MEMORANDUM

1

<u>STATEMENT OF THE CASE</u>

2        Following a jury trial,  BRUGNARA was convicted of two counts of wire fraud

3    (Counts Two and Four), one count of mail fraud (Count Five),  one count of making a false

4    declaration (Count Six), escape (Count Eight) and contempt of court (Count Nine).  The jury

5    returned not guilty verdicts on two wire fraud counts (Counts One and Three) and one count of

6    making a false declaration (Count Seven).

7                <u>OBJECTIONS TO PRE-SENTENCE REPORT</u>

8        1.  <u>Offense Conduct (¶'s 9-21)</u>:

9        The defense objects to the "offense conduct" set out in these paragraphs because the

10   summary indicates that BRUGNARA defrauded Long into selling him "valuable" artwork that

11   he had no intention of paying for as he did not have the finances available to fund the purchase.

12   These paragraphs omit the critical fact, developed at a post-trial evidentiary hearing, that the

13   majority of the artworks purported sold by Maibaum and Long to BRUGNARA were

14   worthless, reflecting substantial misconduct on the part of Maibaum and Long.

15       BRUGNARA, although convicted of these offenses, requests that the Pre-Sentence

16   Report reflect the fact that Maibaum and Long, both experienced art dealers, knowingly sold

17   BRUGNARA millions of dollars of artworks which was either fake, heavily damaged and of

18   questionable authenticity.  Of importance in this regard is the fact that the source of the

19   information provided to the preparer of the Pre-Sentence Report comes from the United States

20   Attorney's Office, reports prepared by the FBI and "details" provided by the case agent.  This

21   Court, having presided over the trial and the hearings in this matter, is in the best position to

22   evaluate the accuracy of the "offense conduct," taking into consideration facts developed after

23   trial and testified to at the evidentiary hearing on the "value" of the artwork in this case.

24       2.      <u>Artwork Value/Loss Analysis (¶'s 22-29)</u>:

25       The defense objects to the "loss" analysis set out in the Pre-Sentence Report.  The

26   defense specifically objects to the claims of Maibaum and Long of what each payed for the

27   Luks portrait, de Kooning paintings, Picasso etchings, Miró drawing and the Valsuani casting

28   of the Little Dancer.  (¶'s22-27).  In light of the revelations brought to light for the first time

DEFENDANT'S SENTENCING MEMORANDUM

1    after trial regarding the "value" of this artwork, purchase price claims are highly questionable.

2    The purported sales of various Little Dancers are also highly suspect in light of the fact

3    Maibaum has been trying to create a market for the highly controversial Valsuani castings of

4    the Little Dancer for years and all sales (save perhaps the purported Hong Kong sale) have

5    centered around his involvement.

6         The defense further objects to the Pre-Sentence Report stating that the "government

7    appraisal" valued the Little Dancer at $1,759,422.  Inexplicably, the government chose not to

8    ask its hired expert to appraise the Little Dancer.  Instead, it relied on the purported auction in

9    Hong Kong as their "proof" of value.  As discussed in the defense briefing on "loss," this is

10   improper as there is no proof that anyone paid any such price for it.  Further, the circumstances

11   surrounding the offering were suspicious, and the catalog lacked critical details that the work

12   was a reproduction and a Valsuani casting.  Price and value are not necessarily equivalent -

13   people frequently pay far more than something is worth, particularly in the art market.

14        The defense believes that "loss" is not a proper basis upon which to judge the

15   seriousness of the offense conduct.  In this case, Maibaum and Long were clearly trying to sell

16   BRUGNARA worthless art and should not be rewarded for their misconduct.  "Loss"

17   calculations overstate the seriousness of the offense conduct because they do not take into

18   consideration the purported "victims'" misconduct.[1]

19

20   [1]   The defense in this regard objects to the "loss" calculation set out in Long's "victim"

21   impact statement.  The statement takes issue with the government and defense experts' appraisals

22   of the heavily damaged Luks portrait, offering instead Long's opinion that she paid $350,000 for

it from Maibaum and its "worth" $450,000, a claim that does not even make sense given her

23   countersuit against Maibaum in which she complains that Maibaum defrauded her because its

really not a portrait of Gertrude Vanderbilt Whitney.  All this must be weighed with the fact she

24   tried to sell BRUGNARA over $7 million of fake de Koonings, whose authenticity problems

would have clearly been noticeable to an "expert" such as herself.  Now distancing herself from

25   Maibaum, one would not be betting on the fact that she will pay Maibaum $7 million for the de

26   Kooning she purchased from Maibaum to unload on BRUGNARA.  Nor is it explainable why,

having the documentation as to the damages to the Luks and two major restorations, she did not

27   disclose this to BRUGNARA, and failed to advise him it was not framed as was shown in the

28               (continued...)

DEFENDANT'S SENTENCING MEMORANDUM

If this Court determines to use "loss" as a guidepost for offense conduct, the defense respectfully requests that the total be set at no more than $836,000, which takes the Pre-Sentence Report's averages for the Luks, Miro, Picasso and de Koonings and $600,000 for the Valsuani casting of the Little Dancer.   This figure most accurately reflects the appraised "value" of the artwork in question.

3.    Victim Impact (¶'s 30-34):

In light of the evidence now before the court, the defense objects to characterizing Maibaum and Long as "victims."  The statements of Long and Maibaum ring hollow in light of the fact most of the artwork they tried to sell to BRUGNARA was worthless.  The fact that it is now worth far less than they tried to get from BRUGNARA is not a function of BRUGNARA's conduct but rather a reflection of the true value of the artwork.  They did not reap their expected millions of dollars from BRUGNARA, but neither was the artwork worth millions.  Long may now call BRUGNARA a thief (along with other choice words) but it must not be forgotten that it was she who first contacted BRUGNARA (having previously sold him questionable art at inflated prices) trying to sell him worthless de Koonings (probably fake) for $7 million.  This leaves one to ponder whether one who fails to pay for something which is worthless is a bigger thief than the one who tries to get millions of dollars for the worthless articles.  In any event, the defense objects to characterizing Maibaum and Long as "victims" and to any payment of attorney's fees to them.  Also, the defense objects to paying anything close to the claimed loss to Maibaum for the missing Little Dancer given the fact that the inflated prices for it (and other similar reproductions) are based solely on the efforts of Maibaum to market these controversial pieces as authentic Degas.  If indeed Maibaum bought this one for about $350,000, he should be able to provide payment records and, upon providing such records, this Court should order restitution in no more than that amount.

---

[1](...continued)
documentation she did send.

4

DEFENDANT'S SENTENCING MEMORANDUM

1

        4.        <u>Adjustment for Obstruction of Justice (¶'s 36-37).</u>

2

        The defense does not object to finding a 2-level obstruction of justice enhancement

3

based on the "escape" and "perjury" convictions.  However, the defense objects to all the other

4

statements set out in great detail in paragraphs 36-38.[2]

5

        In much of what BRUGNARA says, there is a grain of truth in the statement which is

6

then lost in exaggerations and embellishment.  The root cause of this behavior is

7

BRUGNARA's mental illness and consequent delusional thought process.  That said, many of

8

these instances of less than truthful embellishments do not even relate to the instant charges

9

and should not be part of the Pre-Sentence Report.  The fact that BRUGNARA claimed he had

10

never been accused of fraud before [¶ 38 (2)], while contradicted by a civil proceedings years

11

ago, is not relevant to his sentencing in this case.  Similarly, statements made in the tax case

12

relating to his criminal history then [¶ 38 (4)], are not relevant now.[3]  The fact that he denied

13

making a profit in proceedings in the tax case [¶ 38 (1)] should not be part of this case nor

14

included in the Pre-Sentence Report.

15

        Also, the defense objects to the inclusion of claims by BRUGNARA that he was

16

"sick" the day he entered a guilty plea [¶ 38 (5)]; problems regarding scheduling of a

17

psychologist visit [¶ 38 (6)]; statements regarding governmental overreaching in designation

18

[¶38 (7)]; claims as to how many inmates had committed suicide while in custody [¶ 38 (11)];

19

being demanding at a half-way house [¶ 38 (12)]; statement that he had no restraining order

20

against him for the last 20-years when there was one in the last 15-years [¶38 (13)]; denying an

21

extramarital affair [¶ 38 (20)]; denying paternity in another affair [¶ 38 (17)]; confrontations

22

with others while in prison [¶ 38 (21)]; circumstances why his prior attorney withdrew from the

23

case [¶ 38 (22)]; claim that his prior attorney had not adequately consulted with him while in

24

---

25

   [2]    This section takes up 20-pages of the Pre-Sentence Report (pp. 11-30).  In fact, except for

26

the "uncharged conduct" section which is slightly shorter, more attention is devoted to the
allegations set out in this section than any other section of the Pre-Sentence Report.

27

   [3]    It is unclear why an arrest which does not result in a conviction should even be

28

considered as a "criminal history."  Moreover, whether something is a "small" thing is subject to
interpretation.

DEFENDANT'S SENTENCING MEMORANDUM

jail [¶ 38 (23)]; scheduling of luncheons with his family [¶ 38 (28)]; complaints he had previously made regarding particular prosecuting attorneys [¶ 38 (31)]; renter disputes with fly-casting club ramifications [¶ 38 (29)]; convoluted explanation of why he had not made false statement to law enforcement agents [¶ 38 (18); and a claim that Long had a DUI when it had been actually reduced to reckless driving after being arrested for a DUI [¶ 38 (33)].  None of these claims truly obstructed justice and should not be in the Pre-Sentence Report.

Many of the other "false" statements either relate to things BRUGNARA wanted to prove at trial but either the testimony was contrary to what he was trying to establish or was just left hanging with no definitive answer.  The fact that Nick Barbato did not testify that he was building a museum for BRUGNARA is Las Vegas [¶ 38 (3)]; that a SEC lender may fund a commercial loan to someone on supervised release as it is not absolutely prohibited by rule but may choose not to loan for their own reasons [¶ 38 (8)]; opinions as to whether a U.S. Probation Officer understood what "forbearance and corporate restructuring" meant [¶ 38 (10)]; claiming that Long "gifted" him the artwork [¶ 38 (15)]; explanations for his "escape" which were alluded to in questioning and argument [¶ 38 (26)]; failing to provide further details to the court regarding a claimed Las Vegas deal [¶ 38 (27)]; inferences during trial that only four crates were delivered by Long to his home [¶ 38 (30)]; comments during trial that he suggested to Long that she use Ship Art [¶38 (32)]; not knowing the difference between swearing to a counterclaim as opposed to an unverified counterclaim advanced by counsel [¶ 38 (35)]; exaggerating his chances of having cancer [¶ 38 (35)]; exaggerating lack of opportunity to talk to a witness [¶38 (39)]; improper questioning of witnesses during trial implying something which was not true or could not be established  [¶ 38 (37), (38), (40)]; and improper closing arguments [¶ 38 (41), (42)]; improperly equates embellishment and "bad lawyering" with obstruction of justice.[4] Similarly, one wonders whether attempting to collaterialize a loan with artwork is significantly different from actually doing so [¶ 38 (19)].

---

[4]    One hopes that every question asked by a lawyer during trial which proves the opposite fact hoped for by the question not be attributed to the client as an obstruction of justice. Sometimes, you just get the wrong answer, proving that the best laid plans often go awry.

DEFENDANT'S SENTENCING MEMORANDUM

1   BRUGNARA, who once had valuable artwork, did not have any of value during the last several

2   years and did not have any of his more recent loans collateralized with works of art.

3        This Court heard the testimony at trial, punished BRUGNARA for contempt when he

4   crossed the line, and has previously considered statements made during pre-trial supervision in

5   fashioning appropriate remedies when BRUGNARA's compliance was in doubt.  Adding a

6   plethora of previous false statements, exaggerations and embellishments by BRUGNARA

7   made over the years does not advance the sentencing process and should not be included in the

8   Pre-Sentence Report.  Nor does punishing a defendant for statements not made under oath at

9   trial further this process, especially in light of the contempt citations already handed out for

10  such behavior.

11       5.      Adjustment for Acceptance of Responsibility (¶ 39):

12       The defense does not claim that BRUGNARA is entitled to a downward adjustment

13  for "acceptance of responsibility."  However, commenting on the fact that BRUGNARA both

14  privately (during the probation interview) and publicly (during a television interview) continues

15  to protest that he is innocent and will appeal, treads on BRUGNARA's rights to jury trial and

16  freedom of speech.  The court cannot punish BRUGNARA for exercising his right to jury trial.

17  See United States v. Medina-Cervantes, 690 F.2d 715, 717 (9th Cir.1982).

18       6.      Offense Level Computation (¶'s 40-62):

19       The defense objects to the offense level computations contained in the Pre-Sentence

20  Report.  As discussed below (and in other pleadings filed regarding the "loss" issue), the

21  defense objects to the "loss" calculation at $1,415,711.50, resulting in a 16-level "specific

22  offense characteristics" increase.  This Court should not use a "loss" calculation as a criteria for

23  judging the seriousness of the offense conduct in light of Maibaum's and Long's fraud upon

24  BRUGNARA.  Alternatively, the "loss" should be no more than $836,000, resulting in an

25  increase of 14-levels.  Also, there should be no "charitable" misrepresentation 2-level

26  enhancement in this case.  See U.S.S.G. §2B1.1(b)(9)(A).

27       BRUGNARA objects to the addition of two levels under U.S.S.G. §2B1.1(b)(9) for "a

28  misrepresentation that the defendant was acting on behalf of a charitable, educational,

DEFENDANT'S SENTENCING MEMORANDUM

religious, or political organization." (¶ 45.)  A museum is nothing more than a repository for a collection of items.  There is nothing inherently charitable, educational, religious or political about it.  There are many private museums which house and preserve objects but which serve no public purpose.

Further, the conduct at issue is just not the type of conduct contemplated under this guideline provision.  The purpose of this sentencing enhancement is to "punish defendants who take advantage of the generosity and charitable motives of victims." United States v. Treadwell, 593 F.3d 990, 1006 (9th Cir. 2010).  "Taking advantage of a victim's self-interest does not mitigate the seriousness of fraudulent conduct; rather, defendants who exploit victims' charitable impulses . . . create particular social harm." Id.; see also United States v. Ferrera, 107 F.3d at 541, 550 (7th Cir.10997) - ("[T]hat the victims may have been motivated, in part, by self-interest does not mitigate the seriousness of [defendant's] conduct. . . . Rather, the focus of our inquiry must be on the defendant's motivation for making the prohibited misrepresentation.").  That is not to say, however, that a purported victim's misconduct, or outright fraud, should be rewarded by punishing the defendant who may similarly have been motivated by his or her own self-interest.

Stated another way, this guideline is aimed at enhancing punishment for those who prey upon and exploit a person's tendency to be humanitarian.  Id.  The application notes for §2B1.1(b)(9) give three examples of this type of conduct: solicitation for a non-existent famine relief organization; falsely claiming to be a fundraiser for a religious school, and soliciting money for purchase of a fire-engine while diverting funds to personal use.  (U.S.S.G. §2B1.1, App. n 8(b).)  All of these examples involve schemes that tug at the heart strings of the victims.

By contrast, in this case, there was nothing remotely "charitable" in the actions of the "victims."  It was Rose Long, and not BRUGNARA, who proposed, then sold herself, on the idea of putting these art works in a museum, then knowingly left them in a filthy garage in San Francisco.  It was Walter Maibaum, who did not even want his name associated with this transaction, that generously agreed to a "reduced" price of over $7 million for paintings which were falsely attributed to de Kooning and worth practically nothing.  It is clear that Long and

DEFENDANT'S SENTENCING MEMORANDUM

Maibaum acted entirely out of their own selfish interests in lining their own pockets, and not

out of any desire to educate the public by putting these works on public display in a museum.

Indeed, putting fake de Koonings and a heavily damaged and twice-restored "Frankenpainting"

attributed to Luks in a museum for the public to view, would itself, have been a fraud on the

public.  For these reasons, it is unfair to increase the base offense level for the fraud counts by

two levels as is proposed in ¶45.

Further, the defense objects to the "groupings" of counts and believes that all counts

of conviction should be one group.

According to the application notes in §3C1.1, regarding grouping under §3D1.2(c):

> If the defendant is convicted of both an obstruction offense (e.g., 18 U.S.C. §
> 3146 (Penalty for failure to appear);  18 U.S.C. § 1621 (perjury generally))
> and an underlying offense (the offense with respect to which the obstructive
> conduct occurred), the count for the obstruction offense will be grouped with
> the count for the underlying offense under subsection (c) of §3D1.2 (Groups
> of Closely Related Counts).  The offense level for that group of closely
> related counts will be the offense level for the underlying offense increased
> by the 2-level adjustment specified by this section, or the offense level for the
> obstruction offense, whichever is greater.

(U.S.S.G. § 3C1.1, app. n. 8.)  In this case, the escape and the contempt which are grouped

separately in the Pre-Sentence Report, are in the context of the prosecution for the fraud and

perjury charges.  Under §3C1.1 and §3D1.2(c), these charges should be in the same group as

the fraud and perjury charges.  There would thus be no additional level for multiple groups as

set forth in ¶ 58, but the 2-level adjustment for obstruction in ¶ 48 would remain.

If this Court does believe there should be separate groupings, then as to the Count

Group 2 (¶'s 50-55), the defense objects to the 3-level enhancement for "substantial

interference with the administration of justice" (U.S.S.G. §2J1,2(b)(2)) and the 2-level

adjustment for obstruction of justice (U.S.S.G. §3C1.1).  The base level offense contemplates

"obstruction," thereby resulting in impermissible "double counting" and there is no evidence

that the escape/contempt resulted in "substantial interference" with the administration of

justice.  (U.S.S.G. §3C1.1, app. n 7.)

DEFENDANT'S SENTENCING MEMORANDUM

1        7.        Criminal History (¶'s 69-70, 71, 73):

2        BRUGNARA objects to the counting of each of the offenses set forth in ¶¶ 69 -70 as a

3   separate sentence under Guideline §4A1.2.  First, according to the pre-sentence report,

4   BRUGNARA was arrested for both cases on the same date.  There was no intervening arrest

5   separating the two cases.  (§4A1.2(a)(2).)  Both cases were resolved pursuant to plea

6   agreement.  That agreement contemplated concurrent sentences in both cases, which were

7   ultimately imposed.  Although, technically, they were sentenced on two different dates (two

8   days apart), the difference in dates was due solely to the fact that the cases were assigned to

9   different judges, and the second judge's calendar did not permit sentencing on the same day.

10  Because only a single concurrent sentence was contemplated by the plea agreement, the term

11  imposed should be counted once, not twice. (§4A1.2(a)(2)(B).)  Neither crime is a crime of

12  violence, so no additional points are added under §4A1.1(e).  Thus, BRUGNARA should be

13  assigned a total of three criminal history points, not six, under ¶¶ 69-70.

14        This adjustment reduces BRUGNARA's total criminal history points from 8 to 5,

15  putting him in criminal history category III, not IV.

16        The defense also objects the inclusion of BOP "sanctions" in the Pre-Sentence Report.

17  (¶70.)  It is fundamentally unfair for this Court to consider "sanctions" previously meted out in

18  disciplinary hearings with questionable procedural rights in fashioning out the appropriate

19  sentence in this case.  The BOP undoubtedly has records of its own on BRUGNARA and will

20  consider placement on those records and the facts of this case.  Adding his BOP record of

21  "disciplinary hearings" while in custody is unduly prejudicial, unnecessary and fraught with the

22  danger of misuse.  Inmates are undoubtedly not advised that their conduct in prison may well

23  result in a stiffer sentence if they re-offend.  Procedural safeguards to insure the integrity of the

24  fact-finding process for institutional violations will have to be fashioned if this becomes

25  common place.

26        Finally,  the defense objects to the criminal history calculation of Category IV, which

27  is improperly calculated (as discussed above) and also overstates the seriousness of his criminal

28  history.

DEFENDANT'S SENTENCING MEMORANDUM

6.      Other Criminal Conduct (¶'s 74-78):

The defense objects to all the allegations contained in ¶¶ 74-78.  None of this conduct resulted in a conviction and its inclusion in the pre-sentence report is highly prejudicial and inflammatory.  Moreover, it may unfairly be used by the Bureau of Prisons to determine the appropriate housing.

BRUGNARA denies the allegations set out in these paragraphs.  He was not prosecuted because they did not occur as set forth in the Presentence Report.

Most of these allegations have become the staple of all Pre-Sentence Reports on BRUGNARA, yet there has been no attempt to verify any of the alleged misconduct.  It cannot be said that the allegations are not serious; they involve threats to kill witnesses, former mistresses, city officials, bribery, and serious violations of restraining orders.  Yet, none of these resulted in any prosecutions, which speaks volumes as to the credibility of the accusers and the accounts set out in the Pre-Sentence Report.  The inclusion of these allegations is inflammatory, prejudicial and is based up a false allegation.  See United States v. Weston , 448 F.2d 626, 633 (9th Cir. 1971).[5]

The newer, also uncharged, allegations that BRUGNARA tried to bribe a guard and threatened a male nurse are also denied and the defense requests that they be removed from the Pre-Sentence Report.  The inclusion of these unsubstantiated allegations is unfairly prejudicial.

---

[5]      In Weston the court considered the type of information on which a sentencing judge could rely.  The trial court in that case sentenced the defendant to the maximum possible term based on a report of uncharged criminal conduct by the defendant  (Id., at 633.)  The report was based on the opinion of a law enforcement agent, and an unsworn statement by another agent that information from an unidentified informant partially corroborated the charge.  (Ibid.)  The court found this information was lacking a proper factual basis.  (Ibid.)  Noting that false information could not be considered at sentencing, the court held that information of the type at issue was, likewise, insufficiently reliable to be considered at sentencing.  (Id., at 634.)  It would be a "great miscarriage of justice" to require the defendant to disprove the allegation.  (Ibid.)

11

DEFENDANT'S SENTENCING MEMORANDUM

8.     Personal and Family Data (¶ 83):

The defense objects to the selective inclusion of BRUGNARA's brother Aleo's evaluation of what the "family" thinks of him.  Aleo, whose estranged relationship was even documented in a 2008 Pre-Sentence Report, does not speak for the family.  BRUGNARA's other siblings and mother have a good relationship with him and do not share Aleo's views.  It is unknown why only Aleo, who is a Special Agent with the Department of Homeland Security, was singled out for an interview by the preparer of the report.  BRUGNARA's mother, Victoria Brugnara, has been very supportive of BRUGNARA, was also available for an interview, and more representatively speaks for the family.

Further, the defense objects to ¶ 85 wherein the Pre-Sentence Report outlines a dispute with a person and BRUGNARA regarding the fly-casting club activities in high school. Falling under the category of "who cares," whatever happened between rivals in high school, unless it resulted in some sort of criminal activity, should be of no concern to the court for sentencing.

9.     Restitution (¶¶ 130-131):

As previously discussed, the defense objects to restitution being paid to Maibaum. Only upon proof that Maibaum actually paid for this Little Dancer, according to him about $350,000 or the equivalent in euros, should this Court award restitution to him.  His attorney fees resulted from his own misconduct in trying to sell millions of dollars of fake paintings to BRUGNARA, and should not be awarded.  The same should be said for Long's claim for damages.  She is not a unwitting participant.  Long knew the Luks was heavily damaged and that the de Koonings were worthless.  Nor was she unaware of Maibaum's deception.  She was his close associate and had worked with him in the past buying and selling artwork between themselves.  In this case, both Maibaum and Long were trying to reap millions from BRUGNARA by selling him worthless art.  They should not be rewarded with restitution for their efforts.

12

DEFENDANT'S SENTENCING MEMORANDUM

II.

EVALUATION

A fair and reasonable sentence must take into consideration not only the history and characteristics of the defendant but also the nature and circumstances of the offense and the sentence must reflect, in part, the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

This Court considers the guideline calculations as one step in the process and then examines the other §3553(a) factors in reaching a "reasonable" sentence. As explained in Henderson:

> We emphasize that we do not hold that application of §2G2.2 will always result in an unreasonable sentence and that sentencing courts must continue to consider the applicable Guidelines range as "the starting point and the initial benchmark," Gall, 552 U.S. at 49. See Kimbrough, 552 U.S. at 110 (noting that despite its policy disagreement with the crack cocaine Guidelines, the district court "began by properly calculating and considering the advisory Guidelines range.") Sentencing courts must also continue to consider all of the §3553(a) factors in deciding upon the sentence. See id. at 110-11 (describing approvingly the district court's discussion of the relevant §3553(a) factors and stating that the "ultimate question" is whether the sentence was reasonable). Finally, sentencing courts must continue to adequately explain their choice of the sentence, including their policy disagreement with §2G2.2, to allow for meaningful appellate review and to promote the perception of fair sentencing. Gall, 552 U.S. at 50.

Henderson, supra, 649 F.3d at p. 964. While the Guidelines may be respectfully considered, they are one factor among the §3553(a) factors that are to be taken into account in arriving at an appropriate sentence. United States v. Carty, 520 F.3d 984, 992 (9th Cir.2008).

The conduct of Maibaum and Long in this case, trying to sell BRUGNARA millions of dollars worth of bogus art, should be a factor in departing downwards from the sentencing guidelines. So should the impact upon BRUGNARA's family be a consideration. As outlined in the Pre-Sentence Report, the impact on BRUGNARA's family of his continued incarceration has been devastating. Finally, the lasting affects of his mental illness upon his behavior should be considered in arriving at an appropriate sentence. BRUGNARA, according to the recent report of Dr. John Shields suffers from bipolar, delusional and narcissistic personality

13

DEFENDANT'S SENTENCING MEMORANDUM

disorders.[6]  These disorders explain much of BRUGNARA's disorganized thinking, disruptiven behavior and impulsivity.

Maibaum and Long preyed upon BRUGANA's narcissistic personality, and almost delusional belief that he knew something about art, singling him out to purchase worthless art to a tune of $11 million.  Knowing that he had paid $500,000 to Long for a purported Renoir painting which was worth far less, and therefore a perfect "sucker," Maibaum and Long set out to unload fake de Koonings, a heavily damaged Luks painting of questionable authenticity, a controversial Valsuani casting of Degas' Little Dancer (which had just ignominiously been returned to Maibaum by someone who claimed he had been defrauded by Maibaum for selling it to him in the first place), and some etchings by Picasso and a drawing by Miró which had no attached certificate of authenticity.  Begging Long keep Maibaum's name out of the deal, or otherwise both their reputations would be "destroyed," Maibaum created bogus invoices which purported to sell the work to Long so BRUGNARA would think that Long was selling him all this artwork.

Hoping that BRUGNARA would pay millions up front immediately after delivery, the "contingencies" set out were of the impossible type – i.e., using an auction house to prove that the artworks were inauthentic in a world that thrives on deception, forgeries and the inability to definitively distinguish fake from authentic.  Banking on the fact that BRUGNARA appeared to have money based upon his past history, and where he lived and owned a house, Maibaum and Long expected huge dividends from their deception.  It cannot be argued that they did not know that the de Koonings were fake, the Luks was damaged, restored and of questionable authenticity, or that the Little Dancer's authenticity was questionable in the art world because any dealer of their experience would have known the de Koonings were worthless; Long herself had sought (or knew of) the reconstruction of the Luks and later accused Maibaum of cheating her on the purchase; and Maibaum had been trying to market his Valsuani Little

---

[6]   The psychological report done by Dr. Shields is not yet final, and will be filed separately under seal.

DEFENDANT'S SENTENCING MEMORANDUM

1   Dancers as authentic Degas's since he "discovered" them "hidden" away in a storeroom,

2   decades after Degas died with the hope that none of his statutes would be cast in bronze, let

3   alone one that did not even look like his original wax rendition.

4        Fatally overestimating BRUGNARA's ability to pay millions, the last thing that

5   Maibaum wanted was to bring this art "deal" to the authorities wherein certainly someone

6   would have appraised it.[7]  However, the "deal" was brought to the authorities attention after

7   Long changed lawyers, most certainly an unexpected turn of events given the days of

8   "negotiation" between Maibaum's, Long's and BRUGNARA's attorneys.

9        Inexplicably, the extent of Maibaum's and Long conduct was not disclosed until after

10  trial.  Nevertheless, the case had proceeded as if it did not matter whether BRUGNARA

11  himself was being defrauded because, the government posited, that is not a defense to his

12  defrauding them.  But even if not a defense, a proposition which the defense is not ready to

13  concede, it certainly should be considered for sentencing.  Under these circumstances, "loss" is

14  not a proper criteria to measure the seriousness of the criminal conduct for which BRUGNARA

15  was convicted.  If indeed BRUGNARA was the victim of Maibaum and Long's fraud,

16  punishing BRUGNARA for a fictitious and manufactured "loss" to Maibaum and Long

17  rewards their conduct in this mess and insulates them from prosecution for their actions.  The

18  very notion of this turns the meaning of "victim" upside down.

19       The shrill and caustic attack on BRUGNARA in Long's "victim impact" statement

20  aptly demonstrates the upside down nature of this analysis.  Long wants the "loss" to be set at

21  $450,000 for sentencing purposes despite the fact she is not speaking for the prosecution,  for

22  her relatively worthless and heavily damaged Luks painting.  It will, nevertheless, be

23  eventually be returned to her no worse the wear except for the fact that its worth has now been

24

25  _____

26  [7]    The inference that Maibaum did not want the authorities involved was borne out by
    Long's recently filed "victim impact" statement wherein her counsel confirmed that Maibaum
27  did not want the authorities involved and it was only because Long changed attorneys, one with
    former connections to the local United States Attorney's Office, that the authorities were
28  notified.

DEFENDANT'S SENTENCING MEMORANDUM

1   pegged by both the defense and government appraisers to between $4,000 and $40,000, and not

2   $450,000.   Also, for the first time, Long submits proof of its damaged state, implicitly

3   admitting that it was damaged far more than she testified to during trial–a fact she hid from

4   BRUGNARA when she was unloading it on him.  Her answer is that the government's

5   appraiser is not qualified to give his opinion (curiously omitting any such criticism of the

6   defense appraiser).  Presumably, she means that she is still the best judge of its value, the same

7   judgment she showed as an "expert" of the "lovely" de Koonings' which should be in a

8   "museum," a laughable comment given the de Koonings, sold by her for millions of dollars, are

9   worthless and probably fake.  It would be laughable except for the fact that the jury was asked

10  to consider her testimony as expert testimony on the value of the artwork in question, their

11  purported importance of being placed in a museum is being used to enhance BRUGNARA's

12  sentencing guidelines, and, finally, the government argued to the jury that she and Maibaum

13  were the "victims" of a multi-million dollar fraud perpetrated by BRUGNARA.

14          This Court lamented during trial that BRUGNARA's conduct was a blow to justice

15  and notions of a fair trial.  While his conduct was lamentable, a more fundamental problem was

16  not known to this Court.   It was not known until after trial that the artwork in question was

17  almost worthless, that Maibaum and Long had almost pulled off a perfect scam.  The focus on

18  BRUGNARA's behavior had kept hidden the most damaging revelations impacting justice and

19  a fair trial.  Punishing BRUGNARA for his behavior might be superficially satisfying, but it

20  does not further the long term goal that justice be done.  This, in the end, is what trials are

21  about–a search for the truth–and only this Court can save the process.  This can only be done

22  by focusing on what is important and not on the sideshow.  No doubt, this Court had an inkling

23  that something was wrong with this picture (and paintings) but was powerless to do anything as

24  it is not a party to the action.  Now, however, this Court plays a different role and has greater

25  power to see that justice prevails over personality conflicts and boorish behavior.  In a sense,

26  the defense is asking this Court to save BRUGNARA from himself, looking past his *persona*

27  and judge him for what he actually did in this case and not what the government misguidedly

28  claimed at trial.  While it would be an overstatement to call BRUGNARA a "victim," a greater

DEFENDANT'S SENTENCING MEMORANDUM

1    injustice would be done by calling Maibaum and Long "victims" when they orchestrated this

2    fiasco.

3                                          III.

4          THIS COURT SHOULD IMPOSE A SENTENCE OF 30-MONTHS,
       WHICH INCLUDES THE TIME FOR BRUGNARA'S CONTEMPT
5      CITATIONS, BECAUSE IT IS A REASONABLE SENTENCE
       CONSIDERING THE FACTORS SET OUT IN 18 U.S.C. §3553(A).
6

7          Sentencing courts must give "meaningful consideration" to all of the statutory factors

8    in 18 U.S.C. §3553(a).[8]  Section 3553(a) clearly states that a court must impose a sentence that

9    is "sufficient but not greater than necessary to comply with the purposes of sentencing.  This

10   requirement is often referred to as 'the parsimony provision," and the Supreme Court has

11   referred to it as the "overarching instruction" of 18 U.S.C. §3553(a).  See Kimbrough v. United

12   States, 552 U.S. 85 (2007); Gall v. United States, 552 U.S. 38, 47 (2007).  Although the

13   offender's conduct is part of the sentencing equation, it is not the totality of it, and the

14   sentencing court must not focus on the offense at the expense of the individual offender.

15   United States v. Booker, 543 U.S. 220 (2005) and United States v. Ameline, 409 F.3d 1073 (9th

16

17      [8]     The factors set forth in 18 U.S.C. §3553(a) are:

18
     (1) the nature and circumstances of the offense and the history and characteristics of the
19   defendant;

20   (2) the need for the sentence imposed–(A) to reflect the seriousness of the offense, to promote
     respect for the law, and to provide just punishment for the offense; (B) to afford adequate
21   deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant;
     and (D) to provide the defendant with needed educational or vocational training, medical care,
22   or other correctional treatment in the most effective manner;

23   (3) the kinds of sentences available;

24   (4) the kinds of sentence and the sentencing range established for–(A) the applicable category
     of offense committed by the applicable category of the defendant as set forth in the
25   guidelines...;

26   (5) any pertinent policy statement...issued by the Sentencing Commission...that is in effect on
     the date the defendant is sentenced.
27   (6) the need to avoid unwarranted sentence disparities among defendants with similar records
     who have been found guilty of similar conduct; and
28   (7) the need to provide restitution to any victims of the offense.

                                          17

     DEFENDANT'S SENTENCING MEMORANDUM

Cir.2005)(en banc).   The sentence must be long enough to reflect the seriousness of the

offense, provide for just punishment and promote respect for the law.  Further, it should afford

adequate deterrence to criminal conduct in general and protect the public.  It must be

"sufficient but not greater than necessary" to reflect societal concerns and individual

considerations.  As stated by the Supreme Court in Gall, 552 U.S. at 50 n. 6:

> Section 3553(a) lists seven factors that a sentencing court must consider.
> The first factor is a broad command to consider "the nature and
> circumstances of the offense and the history and characteristics of the
> defendant." 18 U.S.C. §3553(a)(1).  The second factor requires the
> consideration of the general purposes of sentencing including:  "the need for
> the sentence imposed–(A) to reflect the seriousness of the offense, to
> promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct; (C) to protect the
> public from further crimes of the defendant; and (D) to provide the defendant
> with needed educational or vocational training, medical care, or other
> correctional treatment in the most effective manner."  §3553(a)(2).  The third
> factor pertains to the "kinds of sentences available, §3553(a)(3); the fourth to
> the Sentencing Guidelines; the fifth to any relevant policy statement issued
> by the Sentencing Commission; the sixth to "the need to avoid unwarranted
> sentence disparities," §3553(a)(6); and the seventh to "the need to provide
> restitution to nay victim," §3553(a)(7).  Preceding this list is a general
> directive to "impose a sentence sufficient, but not greater than necessary, to
> comply with the purposes" of sentencing described in the second factor.
> §3553(a).

A 30-month sentence in this case  is a reasonable sentence.  It reflects a just

punishment for his conduct.  It is more sufficient to punish him for his actions and serve as a

deterrent to others.

18

DEFENDANT'S SENTENCING MEMORANDUM

1

CONCLUSION

2        For the foregoing reasons, BRUGNARA respectfully requests that this Court impose a

3 sentence, including the contempt citation time, totaling 30-months.  This sentence is reasonable

4 within the meaning of Gall v. United States, 552 U.S. 38 (2007) and consistent with the factors

5 set out in 18 U.S.C. §3553(a).  Such a sentence addresses punishment but also provides for his

6 release after a reasonable period of time to address the other aspects of sentencing, treatment

7 for his mental illness, and rehabilitation.

8        Dated: October 1, 2015

9                                        Respectfully submitted,

10

11                                          /s/

GEORGE C. BOISSEAU

12                                          DENA YOUNG

13                                          Attorneys for Defendant

LUKE D. BRUGNARA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19

DEFENDANT'S SENTENCING MEMORANDUM

1  <u>CERTIFICATE OF SERVICE</u>

2      The undersigned hereby certifies that a copy of the foregoing <u>SENTENCING</u>

3  <u>MEMORANDUM</u> was served this date to the following parties and attorneys for parties by e-

4  filing a copy to:

5          Robin Harris
        Benjamin Kingsley
6          Assistant U.S. Attorneys
        United States Attorney's Office
7          Northern District of California
        11th Floor Federal Building
8          450 Golden Gate Avenue
        San Francisco, California 94102

9

10  I caused the following additional parties to be served by e-filing a  copy to:

11

12          Jill Polish Sptalieri
13          United States Probation Officer
        United States Probation Department
14          17th Floor Federal Building
        450 Golden Gate Avenue
15          San Francisco, California 94102
        Fax: (415) 436-7572

16

17      I certify under penalty of perjury that the foregoing is true and correct.

18  Executed this 1st day of October, 2015, in Santa Rosa, California.

19

20                  /s/
                GEORGE C. BOISSEAU

20

DEFENDANT'S SENTENCING MEMORANDUM